# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| Kiyan Rad, on behalf of the UNITED STATES OF AMERICA and STATE OF FLORIDA, <br><br> Plaintiffs/Relator; <br><br> v. <br><br> UNIVERSAL HEALTH SERVICES, INC. and MAXHEALTH, <br><br> Defendants. | Civil Action No. 8:18 cv 224 T 23 JSS <br><br> **COMPLAINT AND JURY DEMAND** <br><br> **Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** |

The United States of America (the "United States") and the state of Florida (the United States and the state of Florida are collectively referred to herein as the "Government"), by and through their *qui tam* Relator Dr. Kiyan Rad, D.O. (the "Relator"), allege:

## PRELIMINARY STATEMENT

1.      This is a civil action brought on behalf of the Government under the Federal False Claims Act, 31 U.S.C. § 3729 – 3733 (the "False Claims Act" or "FCA"), and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 – 68.092 (the "Florida False Claims Act" or the "Florida FCA") to recover treble damages sustained by and civil penalties and restitution owed to the Government as a result of a multi-faceted fraudulent scheme involving physicians[1] (the "Manatee Physicians") affiliated with   defendants

---

[1] The doctors affiliated with Manatee and/or MAXHealth that have participated in the illegal schemes described herein include Waguih El Masry, Jorge Hernandez, Suguna

2

Manatee Memorial Hospital ("Manatee Memorial"), an acute care hospital owned and operated by Universal Health Services, Inc. ("UHS"), and/or MAXHealth, a network of clinics affiliated with Manatee Memorial.   UHS and MAXHealth are referred to collectively as "Defendants."

2.      To enrich themselves at the expense of the Government, Defendants, through physicians and personnel affiliated with Manatee Memorial and/or MAXHealth, engaged in multiple intertwined, unlawful schemes relating to billing practices involving Medicare, Medicaid and TRICARE (collectively "Government Programs"). Additionally, Defendants – independently and/or through the Manatee Physicians – have made false and misleading representations to the Government in order to improperly increase payments received through Government Programs.   First, medical students[2] and/or residents[3] at Manatee Memorial routinely perform examinations of patients outside of the presence and/or without supervision from an attending physician.[4] Pursuant to guidelines issued by the Centers for Medicare and Medicaid Services

---

Kona, Werther Marciales, Aruna Narasimman, Victor Ghobrial, Sean Nonnemaker, Leslie Gomez, and Ronald Grubb.

[2] As used herein, the term "medical student" refers to an individual who is not licensed to practice medicine because he or she has not completed (a) medical school and/or (b) the required year of post-medical school training.

[3] As used herein, the term "resident" refers to any physician who has completed medical school and at least one year of post-medical school training and is licensed to practice general medicine, but is participating in a "residency" during which the physician receives further specialized training relating to a particular area of medicine.

[4] As used herein, the term "attending physician" means a physician who has completed his or her residency and is qualified to practice medicine independently and to supervise residents and medical students.

3

("CMS"), however, medical services performed by medical students or residents are generally only reimbursable by Government Programs if an attending physician is physically present during the key portions of the examination or is available to immediately sign-off on the residents' findings and proposed course of treatment.[5] In a scheme to circumvent this requirement, Manatee Physicians who were not present during the administration of patient care would routinely sign and/or back-date the patient care records days after the patient was seen and treated by a resident or medical student. In some instances, a Manatee Physician would simply give the resident or medical student access to his electronic signature. In these instances, the Manatee Physician may have no knowledge whatsoever about the patient care administered by residents and medical students. Defendants nonetheless fraudulently have billed and continue to bill these services to Government Programs.

3.      Second, the Manatee Physicians regularly bill Government Programs for services that they did not personally perform. Under this scheme, residents will routinely treat up to 100 patients a day. Manatee Physicians will then submit bills to Government Programs as though the Manatee Physician, and not the resident, performed the medical services. In exchange for their participation in this scheme, residents receive monetary

---

[5] *See* Centers for Medicare & Medicaid Services, *Guidelines for Teaching Physicians, Interns, and Residents* ("CMS Guidelines") at 3, 11, 12, available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Teaching-Physicians-Fact-Sheet-ICN006437.pdf (visited on Jan. 23, 2018). The CMS Guidelines define "physically present" as "located in the same room as the patient (or a room that is subdivided with partitioned or curtained areas to accommodate multiple patients) and/or performs a face-to-face service." *Id.* at 11.

4

payments from the Manatee Physicians for each medical service performed on behalf of the Manatee Physicians.

4.      Third, Manatee Physicians routinely refer or cause Manatee Memorial patients to be referred to clinics in which the Manatee Physicians have a financial interest.   When those patients report to the clinics for follow-up treatment, they are frequently seen by residents rather than the Manatee Physician or another doctor in his or her medical group.   The follow-up examination or treatment is nonetheless billed to Government Programs as though these medical services were provided by the Manatee Physician.   Under these circumstances, Government Programs are billed multiple times for treatment allegedly provided by the Manatee Physician – even though the Manatee Physician has never once seen the patient.

5.      Fourth, Manatee Memorial is a teaching hospital, which means that certain expenses are reimbursed through Medicare's Direct Graduate Medical Education (DGME) program in accordance with 42 U.S.C. § 1395ww(h) and 42 C.F.R. § 413.86. Manatee Memorial physicians receive substantial sums of money from the Government in exchange for allegedly providing an educational environment and training for medical students and residents.   But in reality, the attending physicians at Manatee Memorial provide very little oversight, guidance, or training to residents and medical students. Instead, Manatee Memorial makes false and misleading statements about its teaching services to the Government in order to ensure that it continues to receive payments through the DGME program.

6.      Fifth, physicians and/or other personnel at Manatee Memorial and/or

5

MAXHealth clinics engage in other unlawful practices relating to the provision of medical care. For example, Manatee Memorial implements a system in which physicians are instructed by Manatee Memorial personnel to mischaracterize the diagnosis and treatment identified in bills to Government Programs. This practice is known as "upcoding" because it allows Defendants to submit bills for medical care that will garner larger reimbursements than the hospital would have received by billing for the treatment actually provided. As another example of intentionally seeking excessive payments from the government, Manatee Memorial regularly bills Government Programs for its patients' expensive and unnecessary hospital stays. The routine absence of Manatee Physicians from Manatee Memorial also often results in patients being unnecessarily admitted to the hospital because residents are unable to get a Manatee Physician's approval to discharge a patient. Manatee Physicians also routinely admit patients to the hospital over the phone without ever having personally examined them.

7.     These practices challenged herein cause significant unnecessary expenses at the cost of the Government and result in patients receiving suboptimal care and, at times, no care at all. Dr. Rad is aware of three instances of **patient deaths** that occurred while the resident was waiting for a Manatee Physician to attend to a patient in need of care.

8.     31 U.S.C. § 3729(a)(1)(A) – (C), part of the False Claims Act, establishes treble damages liability to the United States for any individual or entity that:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> knowingly makes or uses, or causes to be made or used, a false

6

record or statement material to a false or fraudulent claim; or

conspires to commit a violation of [the foregoing paragraphs].

9.      42 U.S.C. § 1320a-7b(a), part of the Anti-Kickback Statute (the "AKS"), expressly prohibits any individual or entity from "knowingly and willfully" making or causing to be made "any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program," including Government Programs. It further sets forth penalties for individuals or entities that are aware of but conceal or fail to disclose such false statements or misrepresentations "with an intent fraudulently to secure such benefit or payment." It also prohibits individuals or entities that knowingly present a claim for services that were not provided by a licensed physician.

10.     Another part of the AKS, 42 U.S.C. § 1320a-7b(b), prohibits offering, paying, soliciting, or receiving any "remuneration," which includes "any kickback, bribe, or rebate," to "any person to induce such person" to (a) refer an patient to a physician for services that will be billed to Government Programs or (b) orders, arranges for, or recommends a facility or service that is covered by Government Programs. *Id.*

11.     Defendants knew or should have known that they and/or their employees have been submitting claims to Government Programs within the scope of their employment that (a) falsely stated that services had been provided and/or reviewed by physicians rather than residents; (b) falsely certified compliance with the Government's requirement that attending physicians be present during examinations administered by residents; (c) falsely billed for services more expensive than those actually performed; (d)

7

falsely claimed that admission of certain patients to Manatee Memorial hospital was necessary and/or appropriate; (e) made false claims relating to the educational services provided at Manatee; and (f) were tainted by kickbacks and unlawful referral and finders' fees. Yet Defendants, either themselves or by others at the direction or approval of Defendants, have nonetheless have been submitting and continue to submit claims to Government Programs containing false and misleading statements and tainted by kickbacks.

12.     As a result of Defendants' illegal schemes, the Government has paid Defendants tens if not hundreds of millions of dollars in improper Government Program reimbursements.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the Government's claims pursuant to 28 U.S.C. §§ 1331 and 1345.

14.     This Court may exercise personal jurisdiction over Defendants because a substantial part of the acts giving rise to the Government's claims occurred within the State of Florida.

15.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants transact business in this District and/or, in furtherance of its fraudulent schemes, caused to be submitted or conspired to submit false claims in this District.

## THE PARTIES

16.     UHS is a publicly-traded company headquartered in King of Prussia,

8

Pennsylvania. UHS is one of the largest hospital management companies in the United States.

17.     Of relevance here, UHS owns Manatee Memorial,[6] a 319-bed acute care facility located in and serving Manatee County, Florida and surrounding counties. Manatee Memorial is affiliated with more than 500 physicians with a broad range of specialties.[7] Manatee Memorial specializes in, among other things, emergency medicine, cardio/cardiovascular services, inpatient and outpatient surgery, orthopedic and spine surgery and women's health services. Upon information and belief, all personnel affiliated with Manatee Memorial are employees of UHS.

18.     MAXHealth is a privately-owned network of clinics that provides family and internal medicine services. MAXHealth is based in Florida and operates through seven locations in the Bradenton area, including in Manatee County.[8] Many of the practitioners affiliated with MAXHealth hold privileges at Manatee Memorial that allow them to perform procedures or operations at or admit patients to the hospital.

19.     Numerous attending physicians are affiliated with Manatee. Those that have engaged in the activity described in this Complaint include the following attending physicians: (1) Dr. Waguih El Masry ("Dr. El Masry"); (2) Dr. Jorge Hernandez ("Dr. Hernandez"); (3) Dr. Suguna Kona ("Dr. Kona"); (4) Dr. Werther Marciales ("Dr.

---

[6] UHS, *Our Locations, available at* https://www.uhsinc.com/our-communities/ (last visited Jan. 23, 2018);Manatee Memorial Hospital *About the Hospital, available at* https://www.manateememorial.com/about (visited Jan. 23, 2018).

[7] *See* https://www.manateememorial.com/about.

[8] MAXHealth, *Our Locations, available at* https://mymaxdoc.com/our-locations/ (visited Jan. 23, 2018).

Marciales"); (5) Dr. Aruna Narasimman ("Dr. Narasimman"); (6) Dr. Victor Ghobrial ("Dr. Ghobrial"); (7) Dr. Sean Nonnemaker ("Dr. Nonnemaker"); (8) Dr. Leslie Gomez ("Dr. Gomez"); and (9) Dr. Ronald Grubb ("Dr. Grubb"). Dr. Narassimman, Dr. Kona, and Dr. Marciales are affiliated with MAXHealth.[9]

20.    Relator Kiyan Rad, D.O. performed his residency at Manatee Memorial between 2014 and 2017. He has treated patients at Manatee Memorial as well as other medical facilities and clinics associated with Manatee.

21.    Relator brings this action on behalf of the Government pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 – 3733, and the Florida False Claims Act, Fla. Stat. Ann. §§ 68.083.

## STATUTORY BACKGROUND

22.    In relevant part, the FCA, 31 U.S.C. § 3729(a)(1)(A) – (C), establishes treble damages liability to the United States for any individual or entity that:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or
>
> conspires to commit a violation of [the foregoing paragraphs].

Within the meaning of the FCA, "knowingly" is defined to include reckless disregard and deliberate ignorance. 31 U.S.C. § 3729(b)(1). In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.

23.    In relevant part, 42 U.S.C. § 1320a-7b(a) provides that whoever:

---

[9] *See* MAXHealth, *Our Physicians*, *available at* https://mymaxdoc.com/meet-our-physicians/ (visited Jan. 23, 2018).

(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f) of this section),

(2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment,

(3) having knowledge of the occurrence of any event affecting

    (A) his initial or continued right to any such benefit or payment, or

    (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized,

(4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person,

(5) presents or causes to be presented a claim for a physician's service for which payment may be made under a Federal health care program and knows that the individual who furnished the service was not licensed as a physician, or

(6) for a fee knowingly and willfully counsels or assists an individual to dispose of assets (including by any transfer in trust) in order for the individual to become eligible for medical assistance under a State plan under subchapter XIX of this chapter, if disposing of the assets results in the imposition of a period of ineligibility for such assistance under section 1396p (c) of this title,

shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than five years or both, or (ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be

11

guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both.

24. 42 U.S.C. § 1320a-7b(a) also provides that a violation of its prohibitions can lead to up to a one-year restriction or suspension from any Federal health care program that the entity would be otherwise eligible for.

25. In relevant part, the AKS, 42 U.S.C. § 1320a-7b(b), provides as follows:

(b) Illegal Remunerations.

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service,

12

> or item for which payment may be made in whole or in part
> under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than
> five years, or both.

26.     For purposes of the AKS, "remuneration" includes the transfer of anything

of value, whether cash or in-kind consideration, directly or indirectly, covertly or overtly.

Importantly, the statute has been interpreted to cover any arrangement where one purpose

of the remuneration is to obtain money for referral of services or to induce further

referrals.

27.     The AKS is designed to, among other things, prevent fraudulent actives

that increase the cost of patient care and contravene patient choice.

28.     The AKS was amended in March 2010 as part of the Patient Protection

and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a

violation of the AKS constitute violations of the FCA.  42 U.S.C. § 1320a-7b(g).  The

PPACA also makes clear that violations of its anti-kickback provisions, like violations of

the FCA, may occur even if an individual does "not have actual knowledge" or "specific

intent to commit a violation."  Pub. L. No. 111-148, 124 STAT. 759 § 6402 (adding new

section, § 1128J(h)).

29.     To ensure compliance with program requirements, every federally-funded

health care program requires every provider or supplier to ensure compliance with all

federal laws governing the provision of health care services in the United States.

30.     The FCA is violated when claims that contain false or misleading

information are submitted to Government Programs.  This includes bills that reflect

13

services not rendered, services that were not necessary, or services that were provided in violation of the law.

31.     Compliance with the AKS is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (stating, in part, that "a claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]"); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3d Cir. 2011) (stating that "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare").

32.     The AKS contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute.  *See* 42 U.S.C. § 1320a-7b(b)(3).  None of the statutory exceptions or regulatory safe harbors protect Defendants from liability for the conduct alleged herein.

33.     The Florida False Claims Act, Fla. Stat. Ann. § 68.082, is an analog to the FCA.  It provides, in relevant part,

> (2)   Any person who:
>
>> (a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>>
>> (b)   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>>
>> (c)   Conspires to commit a violation of this subsection; . . .
>
> is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the state sustains because of the act of that person.

34.     The Florida False Claims Act has a *qui tam* provision, found at Fla. Stat

14

Ann. § 68.083.

35.    Fla. Stat. § 409.920 governs Medicaid provider fraud.    It provides, in

relevant part:

(2)(a)    A person may not:

1.    Knowingly make, cause to be made, or aid and abet in the making of any false statement or false representation of a material fact, by commission or omission, in any claim submitted to the agency or its fiscal agent or a managed care plan for payment.

2.    Knowingly make, cause to be made, or aid and abet in the making of a claim for items or services that are not authorized to be reimbursed by the Medicaid program.

3.    Knowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source.

4.    Knowingly make or in any way cause to be made any false statement or false representation of a material fact, by commission or omission, in any document containing items of income and expense that is or may be used by the agency to determine a general or specific rate of payment for an item or service provided by a provider.

5.    Knowingly solicit, offer, pay, or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.

6.    Knowingly submit false or misleading information or statements to the Medicaid program for the purpose of being

15

accepted as a Medicaid provider.

7.  Knowingly use or endeavor to use a Medicaid provider's identification number or a Medicaid recipient's identification number to make, cause to be made, or aid and abet in the making of a claim for items or services that are not authorized to be reimbursed by the Medicaid program.

Violation of Fla. Stat. § 409.920 can constitute a felony and result in monetary penalties and reimbursement to Medicaid of fraudulent bills.  Fla. Stat. § 409.920(2)(b) and (3).

36.  In relevant part, the Stark Law, 42 U.S.C.S. §1395nn, provides as follows:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

(2) Financial relationship specified

For purposes of this section, a financial relationship of a physician (or an immediate family member of such physician) with an entity specified in this paragraph is—

(A) except as provided in subsections (c) and (d) of this section, an ownership or investment interest in the entity, or

(B) except as provided in subsection (e) of this section, a compensation arrangement (as defined in subsection (h)(1) of this section) between the physician (or an immediate family member of such physician) and the entity.

16

> An ownership or investment interest described in subparagraph (A) may be through equity, debt, or other means and includes an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service.

37.     Penalties for violation of the Stark Law are specified under 42 U.S.C.S. §1395nn(g). These include denial of payment and/or refund of payment for services, neither of which require proof of intent or knowledge. Civil monetary penalties of up to $15,000 can be levied for each instance in which a person knowingly presents or causes a bill or claim in violation of the Stark Law. A physician or entity that enters into an arrangement or scheme that they know or should know violates the Stark Law may be fined up to $100,000 for each such arrangement or scheme. A violation of the Stark Law also constitutes a violation of the FCA. Therefore, the civil monetary penalties set forth in the FCA for a violation of § 1320a-7a(a) also apply to violations of the Stark Law.

38.     The Florida Anti-Kickback Statute, Fla. Stat. § 456.053, also prohibits self-referrals by physicians. The Florida Anti-Kickback provides that "[a] health care provider may not refer a patient for the provision of designated health services to an entity in which the health care provider is an investor or has an investment interest." Fla. Stat. § 456.053(5)(a). Investment interests may include "an equity or debt security issued by an entity, including, without limitation, shares of stock in a corporation, units or other interests in a partnership, bonds, debentures, notes, or other equity interests or debt instruments." Fla. Stat. § 456.053(3)(k). Violations of this statue result in monetary penalties of up to $15,000 for each improperly self-referred service and up to $100,000 for participation in an improper referral scheme. Fla. Stat. § 456.053(5)(e)-(f).

17

39.     The Florida Patient Brokering Act, Florida Stat. § 817.505,

It is unlawful for any person, including any health care provider or health care facility, to:

(a)   Offer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of a patient or patronage to or from a health care provider or health care facility;

(b)   Solicit or receive a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring a patient or patronage to or from a health care provider or health care facility;

(c)   Solicit or receive a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgment of treatment from a health care provider or health care facility; or

(d)   Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c).

Violation of the Florida Patient Brokering Act is a felony and results in monetary fines up to $500,000. Florida Stat. § 817.505(4).

## **AFFECTED HEALTH PROGRAMS**

40.     Manatee Memorial and MAXHealth both participate in Government Programs.[10] These programs include Medicare, Medicaid, and TRICARE.

### **Medicare**

41.     Medicare is a federal program that provides federally-subsidized health insurance primarily for persons who are 65 or older or are disabled. *See* 42 U.S.C. §§

---

[10] MAXHealth *Accepted Insurance, available at* https://mymaxdoc.com/patient-resources/accepted-insurance/ (visited on Jan. 23, 2018).

1395 *et seq.* ("Medicare Program").   Medicare is administered by CMS, which is overseen by the United States Department of Health and Human Services ("DHS").

42.     The benefits provided by Medicare Part A ("Part A") include inpatient hospital services, post-hospital extended care services, home health services, nursing home care and hospice care.  42 U.S.C. § 1395d.  Medicare Part B ("Part B") provides patients with supplemental coverage for additional medical services, preventative care, durable medical equipment, outpatient services, laboratory tests, x-rays, mental health care, and some home health and ambulance services.  42 U.S.C. 1395k.

43.     To be eligible for Medicare reimbursement, claims must comply with two sets of guidelines issued by CMS:  (1) the General Documentation Guidelines; and (2) the Evaluation and Management Documentation Guidelines (collectively, the "Guidelines").[11]

44.     According to the Guidelines, claims are only eligible for payment by Medicare if the medical services were furnished by a physician who is not a resident.[12] However, claims for services performed by a resident may be submitted if the services were furnished when an attending physician was physically present (*i.e.*, in the same room as the patient) during the critical or key portions of the service.[13]

45.     Medicare also pays for medical services provided by residents under the

_____

[11] *See* CMS Guidelines at 3; Centers for Medicare & Medicaid Services, *1997 Documentation Guidelines for Evaluation and Management Service*, *available at* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/Downloads/97Docguidelines.pdf (visited Jan. 23, 2018).

[12] 42 U.S.C. 1395(k)(a)(2); CMS Guidelines at 3.

[13] CMS Guidelines at 3, 11.

DGME physician education program.  Under the DGME exception, the services provided by residents generally must not be billed to Medicare as though the services were performed by an attending physician.   Instead, a hospital receives compensation for medical care provided by residents through the payments it receives for its participation in the DGME program.[14]  If a teaching facility in the DGME program is an approved primary care center, however, certain medical services provided by residents and pertaining to primary care may be billed to Medicare.  CMS directs that "any contribution and participation of a student to the performance of a billable service must be performed in the physical presence of a teaching physician or resident in service that meets teaching physician billing requirements."[15]

46.     Payments to health care providers through Medicare come from an account within the Federal Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 1395(i) and (t); 42 U.S.C. § 13951(a).

47.     To receive Part A and Part B payments, sponsors, as well as their authorized agents, employees, and contractors, are required to comply with all applicable federal laws, regulations, and CMS instructions.

48.     Medicare also enters into agreements with physicians to establish the physician's eligibility to participate in the Medicare program.   To be eligible for participation in the Medicare program, physicians must certify that they agree to comply with federal health care laws, including the Anti-Kickback Statute.  Specifically, on the

---

[14] *Id.* at 3.

[15] *Id.* at 7.

20

Medicare enrollment form, CMS Form 855I, the "Certification Statement" that the medical provider signs states: "You MUST sign and date the certification statement below in order to be enrolled in the Medicare program.  In doing so, you are attesting to meeting and maintaining the Medicare requirements stated below."  Those requirements include:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

49.     When submitting a claim using the CMS claim form, the provider certifies that the claim, whether submitted by the provider or on the provider's behalf, "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute . . . ." Moreover, the provider certifies that the services claimed on the form "were medically necessary and personally furnished by [the provider] or were furnished incident to [the provider's] professional service . . . ."[16]

---

[16] Centers for Medicare & Medicaid Services, *CMS 1500 – Health Insurance Claim Form*, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (visited Jan. 23, 2018).

21

**Medicaid**

50.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled.  Each state administers a State Medicaid program.

51.     The federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

52.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Federal funding under Medicaid is provided only when there is a corresponding state expenditure for a covered Medicaid service to a Medicaid recipient.  The federal government pays to the state the statutorily established share of the "total amount expended . . . as medical assistance under the State plan."  42 U.S.C. § 1396b(a)(l).

53.     Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment.  After the end of each quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated

22

expenditures to actual expenditures).  42 C.F.R. § 430.30.

54.     Claims arising from false statements and illegal kickbacks are not authorized to be paid under state regulatory regimes.  In fact, providers who participate in the Medicaid program must sign enrollment agreements with their states that certify compliance with the state and federal Medicaid requirements, including the AKS. Although there are variations among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all state and federal laws and Medicaid regulations in billing the state Medicaid program for services or supplies furnished.

55.     Medicaid in Florida is administered by the Agency for Health Care Administration ("AHCA").  In Florida, Medicare provider agreements are governed by Fla. Stat. § 409.907, which states that the AHCA "may make payments for medical assistance and related services rendered to Medicaid recipients only to an individual or entity who has a provider agreement in effect with the agency, who is performing services or supplying goods in accordance with federal, state, and local law."  Florida law further provides that "[e]ach provider agreement shall require the provider to comply fully with all state and federal laws pertaining to the Medicaid program. . . ."  Fla. Stat. § 409.907(1).

56.     The AHCA also requires that "[a]ll statements or documents submitted to AHCA or the Medicaid fiscal agent by the billing agent must be true and accurate."  The penalty for filing a claim with false information is termination from participation of the

23

agent or denial of a billing agent's application for enrollment."[17]  The AHCA categorizes Medicaid abuse as

> provider practices that are inconsistent with generally accepted business or medical practices and that result in an unnecessary cost to the Medicaid program or in reimbursement for goods or services that are not medically necessary, coded incorrectly on the claim, or that fail to meet professionally recognized standards for health care.  Abuse includes recipient activities that result in unnecessary cost to the Medicaid program.  Abuse may also include a violation of state or federal law, rule or regulation.[18]

Overpayment, which "includes any amount that is not authorized to be paid by the Medicaid program whether paid as a result of inaccurate or improper cost reporting, improper claims, unacceptable practices, fraud, abuse or mistake," is also categorized as Medicaid abuse by the AHCA.  The AHCA defines provider fraud as "an intentional deception or misrepresentation made by a person with the knowledge that the deception results in unauthorized benefit to herself or himself or another person," including any act that constitutes fraud under Federal or state laws.[19]

### TRICARE

57.    TRICARE is part of the United States military's health care system, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries,

---

[17] Florida Medicaid Provider General Handbook ("Florida Medicaid Handbook"), at 2-66, *available at* http://ahca.myflorida.com/medicaid/review/General/59G_5020_Provider_General_REQ UIREMENTS.pdf (visited Jan. 23, 2018).

[18] Florida Medicaid Handbook at 5-3.

[19] *Id.*

including dependents of active duty personnel, and military retirees and their dependents. The military health system, which is administered by the Department of Defense ("DOD"), is composed of the direct care system, consisting of military hospitals and military clinics, and the benefit program, known as TRICARE. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service benefits.

58.     While some physicians enroll in the TRICARE program as network or participating providers, any physician that is licensed, accredited and meets other standards of the medical community is authorized to provide services to TRICARE beneficiaries. Physicians who are enrolled in the TRICARE network must expressly certify their compliance with TRICARE's regulations. Yet all providers that provide services to TRICARE beneficiaries, whether network providers or non-participating providers, are required to comply with TRICARE's program requirements, including its anti-abuse provisions. 32 C.F.R. § 199.9(a)(4). TRICARE regulations provide that claims submitted in violation of TRICARE's anti-abuse provisions can be denied. *Id.* § 199.9(b). Kickback arrangements and submission of fraudulent claims, including claims with "[m]isrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services," are included within the definition of abusive situations that constitute program fraud. *Id.* § 199.9(c)(6) and (12).

## RELATOR'S INVESTIGATION

59.     To detail Defendants' unlawful conduct, Relator provides below numerous

examples of bills submitted to Government Programs that contain false or misleading statements or that are tainted by kickbacks and Stark Law violations. Realtor also relies on his personal knowledge and experiences of Defendants' fraudulent practices based on his three years working as a resident at Manatee Memorial.

## THE FRAUDULENT SCHEMES

60.     Based on Relator's investigation, there is overwhelming evidence that Defendants, with and through the Manatee Physicians and/or other of Defendants' employees acting in the scope of their employment, engaged in several overlapping schemes to fraudulently bill Government Programs for excessive, improper, and/or ineligible medical services and to create a system of self-references and kickbacks, both of which substantially increased their payments from Government Programs.

61.     First, residents and medical students working at Defendants' hospital and/or clinics frequently performed patient examination and treatment without the required supervision from an attending physician.

62.     Second, Manatee Physicians regularly submitted bills to Government Programs for patient care that they claimed they themselves had performed, but which was in fact performed by residents at Defendants' facilities.

63.     Third, Manatee Physicians, and residents acting on behalf of Manatee Physicians, regularly referred patients who received care at Manatee Memorial to themselves and/or their own clinics for follow-up care.

64.     Fourth, Manatee Memorial greatly misrepresented the amount of teaching and training opportunities being providing to medical students and residents at Manatee

26

Memorial in order to receive payment from the Government through the DGME program.

65.   Fifth, Defendants engaged in fraudulent schemes to obtain excessive reimbursements from Government Programs through practices such as upcoding and unnecessarily admitting patients to the hospital.

### RESIDENTS AND MEDICAL STUDENTS AT MANATEE MEMORIAL AND/OR MAXHEALTH CLINICS PROVIDED CARE WITHOUT AN ATTENDING PHYSICIAN PRESENT

66.   Medical services provided by residents working in a hospital that is part of the DGME program "are specifically excluded from being billed to Government Programs as "physician services." 42 § C.F.R. 415.200.  Based on Relator's first-hand experience at Manatee, residents working at the hospital regularly provide services without the presence of an attending physician as required for Government Programs reimbursement.   Indeed, it was not infrequent for residents to perform patient examinations and treatment on their own, with no supervision or guidance from attending physicians.  Under these circumstances, the resident would have to rely on his or her own judgment or turn to a research database such as UpToDate if they were unsure how to proceed.

67.   Defendants nonetheless billed Government Programs for medical services provided by residents as though a Manatee Physician had performed and/or been present during the patient's examination and treatment, in violation of the Guidelines.  Bills submitted to Government Programs must contain documentation of the patient services signed by both the resident and the attending physician at the time the care was

27

administered.[20]   This requirement became a problem for Defendants because there frequently was no attending physician present for the medical services.  To get around this problem, the Manatee Physicians devised two strategies.  One option was for the Manatee Physician to review and sign the patient care records well after the services were performed – sometimes days after.

68.     Defendants also circumvented the requirements set forth in the Guidelines by giving medical students and residents the Manatee Physicians' logon and password information for the patient record system so that the students and/or residents could simply log on as the Manatee Physician and electronically sign patient records.  The latter scheme often resulted in patients been seen and discharged from Manatee Memorial and MAXHealth clinics without an attending physician ever reviewing the diagnosis and treatment provided by residents.

69.     Manatee Memorial was aware or should have been aware that residents at the hospital were providing medical services without the presence of an attending physician.  Indeed, the fact that the Manatee Physicians were not present for patient examination and care is facially apparent from the billing records that Manatee Memorial submitted to Government Programs.  For example, in numerous records of patient services, the signature of the Manatee Physician is dated **days or even weeks** after the patient was seen by a resident.  The below chart provides a summary of medical service records demonstrating this fraudulent activity, which are attached to this Complaint as Exhibits 1 through 21:

---

[20] CMS Guidelines at 6.

| Resident | Patient Initials | Date of Resident Signature | Attending Physician | Date of Attending Physician Signature | Exhibit # |
|---|---|---|---|---|---|
| Dr. Rad | LL | 02/27/15 | Dr. Kona | 03/23/15 | Ex. 1 |
| Dr. Rad | LL | 03/01/15 | Dr. Kona | 03/23/15 | Ex. 1 |
| Dr. Rad | VA | 06/18/16 | Dr. El Masry | 06/27/16 | Ex. 2 |
| Dr. Gupta | EW | 07/18/16 | Dr. Hernandez | 07/26/16 | Ex. 3 |
| Dr. Rad | LM | 06/18/16 | Dr. El Masry | 06/27/16 | Ex. 4 |
| Dr. Rad | WM | 06/19/16 | Dr. El Masry | 06/27/16 | Ex. 5 |
| Dr. Rad | DJ | 06/19/16 | Dr. El Masry | 06/27/16 | Ex. 6 |
| Dr. Lindley | HB | 09/24/15 | Dr. Hernandez | 10/02/15 | Ex. 7 |
| Dr. Smith | HB | 11/25/15 | Dr. El Masry | 03/01/16 | Ex. 8 |
| Dr. Hattenhauer | HB | 03/26/16 | Dr. El Masry | 04/04/16 | Ex. 9 |
| Dr. Rad | HB | 06/18/16 | Dr. El Masry | 06/27/16 | Ex. 10 |
| Dr. Rad | JH | 06/18/16 | Dr. El Masry | 06/27/16 | Ex. 11 |
| Dr. Rad | CO | 06/19/16 | Dr. El Masry | 06/27/16 | Ex. 12 |
| Dr. Bower | CO | 06/27/15 | Dr. Grubb | 08/06/15 | Ex. 13 |
| Dr. Xu | AS | 03/29/17 | Dr. El Masry | 04/18/17 | Ex. 14 |
| Dr. Xu | AS | 04/03/17 | Dr. El Masry | 04/18/17 | Ex. 14 |
| Dr. Bower | AC | 04/24/16 | Dr. Hernandez | 05/17/16 | Ex. 15 |
| Dr. Skemp | RW | 01/07/17 | Dr. Hernandez | 01/17/17 | Ex. 16 |
| Dr. Anderson | RW | 04/23/17 | Dr. Gomez | 05/04/17 | Ex. 17 |
| Dr. Bonilla | ML | 09/19/16 | Dr. El Masry | 10/04/16 | Ex. 18 |

29

| Resident | Patient Initials | Date of Resident Signature | Attending Physician | Date of Attending Physician Signature | Exhibit # |
|---|---|---|---|---|---|
| Dr. Zitomer | JV | 12/31/15 | Dr. Hernandez | 01/13/16 | Ex. 19 |
| Dr. Zitomer | JV | 01/01/16 | Dr. Hernandez | 01/13/16 | Ex. 19 |
| Dr. Vanraphorst | JV | 01/01/16 | Dr. Stroh | 02/24/16 | Ex. 20 |
| Dr. Mitchell | RP | 12/29/15 | Dr. Hernandez | 01/13/16 | Ex. 21 |

70.     Given the frequency of these fraudulent practices, a review of Manatee Memorial's medical records are certain to establish that the Manatee Physicians have retroactively endorsed a resident's diagnosis and treatment with respect to thousands, if not tens of thousands, of patients.

71.     Defendants cannot rely on the "primary care" exception specified in the Guidelines, whereby a hospital may bill for certain services provided by a resident without the presence of an attending physician.  This exception applies only for lower- and mid-level emergency medical services and only if, among other things, the supervising teaching physicians: (1) have no responsibility other than supervising the residents when the services are furnished by the residents; (2) have primary medical responsibility for the patients receiving services from the residents; (3) review the care furnished by the residents either during or immediately after each visit; and (4) document participation in the review and direction of services provided by the resident, including that the teaching physician reviewed the patients' medical history and diagnosis, the

residents' physical examination findings and the treatment plan.[21]

72.     Here, the "primary care" exception does not apply to the challenged conduct for multiple reasons.  First, the Manatee Physicians had numerous other responsibilities beyond supervising residents – indeed, they were oftentimes not even on the premises of the hospital during the relevant time.  Second, the Manatee Physicians did not have the primary responsibility for treating the patients – indeed, the Manatee Physicians' "involvement" with the patient files regularly occurred days or weeks after the diagnosis was made and treatment was administered.  Third, the Manatee Physicians did not review the care furnished by the residents either during or immediately after each visit, as the evidence summarized above makes clear.  Finally, the Manatee Physicians' practice of "rubber stamping" the residents falls short of the documentation requirements set forth in the Guidelines.  Defendants therefore cannot submit bills to Government Programs for work performed by residents without the presence of an attending physician through the "primary care" exception.

73.     Defendants have knowingly submitted bills to Government Program for medical services provided by a resident in the absence of an attending physician.  In doing so, they have received millions of dollars from the Government for non-reimbursable medical services.  Defendants' fraud, as perpetrated through the Manatee Physicians, furthermore puts patients at risk.  Medical students and residents are still in

---

[21] *See* Centers for Medicare & Medicaid Services, *Guidelines for Teaching Physicians, Interns, and Residents* at 3, available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Teaching-Physicians-Fact-Sheet-ICN006437.pdf (visited Jan. 23, 2018).

31

the training phase of their medical education, which is why supervision of their diagnoses and treatments by an experience and certified attending physician is required for Government Programs reimbursement. Defendants' practice of allowing these inexperienced students and residents to provide patient care without supervision increases the risk of a misdiagnosis or incorrect treatment.

74.     Indeed, Dr. Rad is aware of three instances of patient deaths that occurred while the resident was waiting for an attending physician to participate in patient care.

## ATTENDING PHYSICIANS BILLED GOVERNMENT PROGRAMS FOR SERVICES THAT THEY DID NOT PERFORM

75.     In addition to Defendants' practice of allowing residents to provide patient services without the presence of an attending physician, and improperly billing Government Programs for said services, Defendants were aware of and participated in a scheme that allowed Manatee Physicians to further shift their duties on to residents.

76.     Manatee, MAXHealth, and their affiliate health care providers often experience a high volume of patients seeking treatment. There were at least two solutions to address these high volumes. The Manatee Physicians could work longer hours and more days in order to ensure sufficient coverage to provide care to all patients. This solution was not acceptable to the Manatee Physicians. Alternatively, Defendants could hire and/or contract additional qualified physicians to help carry the patient load at their health care facilities. This solution was also not acceptable to Defendants. Ultimately, high patient volume was addressed by relying again on residents.

77.     Starting as early as 2014, when Dr. Rad began his residency at Manatee Memorial, certain Manatee Memorial physicians devised an arrangement by which

32

residents were paid essentially a "finder's fee" for locating patients in need of medical services, administering patient care, and then allowing the non-resident physicians to bill Government Programs and private insurers as if they had seen the patient themselves.

78.     This arrangement was formalized through a contract between the Manatee Physicians and the residents.  For instance, under the agreement, the residents were paid in the form of a check from the Manatee Physicians for: (1) $15 to see a patient in the hospital (a service billed to Government Programs by the Manatee Physicians for $100); (2) $20 to see a patient in a nursing home (billed by the Manatee Physicians for $76); (4) $50 to complete a history and physical on a patient (billed by the Manatee Physicians for $200); and (4) $10 to complete a discharge summary on a patient (billed by the Manatee Physicians for $100).  Thus although the Manatee Physicians had to pay the residents a small fee for their services, they nonetheless made a significant profit from the arrangement.

79.     This arrangement was used most frequently by three of the Manatee Physicians: Drs. El Masry, Hernandez, and Nonnemaker.   Manatee Memorial management was fully aware of the fraudulent scheme between residents and Manatee Physicians, and also knew that bills submitted to Government Programs for these services "provided by the Manatee Physicians" were false.  It nonetheless made no effort to stop the unlawful practice.

80.     By relying on residents to perform their jobs, several of the Manatee Memorial physicians – including but not limited to Drs. Hernandez, Gomez, Marciales, and El Masry – would routinely charge Government Programs for medical services for as

1345085

many as 100 patients per day, often treated at different facilities.  Given that a 2013 survey by the American Academy of Family Physicians has found that "the average member of that group has 93.2 'patient encounters' each week . . . about 19 patients per day,"[22] the notion that many of Manatee Memorial's attending physicians could routinely treat up to 100 patients per day is facially absurd.  The sheer volume of bills being submitted to Government Programs by the Manatee Physicians would have made this fraudulent scheme apparent to Manatee Memorial's personnel as they performed their bill processing duties.

81.    Additionally, Manatee Physicians would routinely admit patients to the hospital over the phone, without having personally examined the patient.  The Manatee Physicians would later follow-up with the patient, several days after admission, and back-date the patient charts and services billed as if the attending saw the patient the day of admission.  This practice is best illustrated by the documents attached hereto as Exhibits 22 through 26, which were signed by Dr. Ghobrial, who routinely admits patients over the phone.  As Exhibits 22 through 26 show, Dr Ghobrial frequently copies and pastes patient narrative to create false charting with the date of service as the only noticeable difference.  His signed, fraudulent charts are often noted with signatures signed in close temporal succession (sometimes less than one minute apart) even though they may span several days of patient visits that never occurred.  Exhibits 22 through 26 are summarized

---

[22] Washington Post, *How Many Patients Should Your Doctor See Each Day?*, *available at* https://www.washingtonpost.com/news/to-your-health/wp/2014/05/22/how-many-patients-should-your-doctor-see-each-day/?utm_term=.7f43e81d34be (visited Jan. 23, 2018).

in the below chart:

| Patient Initials | Date of Note | Time of Note | Date of Signature | Time of Signature | Exhibit # |
|---|---|---|---|---|---|
| VS | 04/12/16 | 2236 | 04/13/16 | 1403 | Ex. 22 |
| VS | 04/13/16 | 1211 | 04/13/16 | 1406 | Ex. 22 |
| VS | 04/19/16 | 1603 | 04/25/16 | 1353 | Ex. 22 |
| VS | 04/20/16 | 1239 | 04/25/16 | 1354 | Ex. 22 |
| VS | 04/21/16 | 1904 | 04/25/16 | 1357 | Ex. 22 |
| VS | 04/22/16 | 1724 | 04/25/16 | 1358 | Ex. 22 |
| VS | 04/24/16 | 1652 | 04/25/16 | 1358 | Ex. 22 |
| VS | 04/25/16 | 1359 | 04/25/16 | 1359 | Ex. 22 |
| VS | 04/26/16 | 1922 | 04/26/16 | 1922 | Ex. 22 |
| VS | 04/27/16 | 1916 | 04/28/16 | 1922 | Ex. 22 |
| RoBo | 03/21/15 | 1912 | 03/22/15 | 1728 | Ex. 23 |
| RoBo | 03/22/15 | 1726 | 03/23/15 | 1521 | Ex. 23 |
| RoBo | 03/23/15 | 1522 | 03/23/15 | 1522 | Ex. 23 |
| RoBo | 05/03/15 | 1620 | 05/04/15 | 1946 | Ex. 23 |
| RoBo | 05/04/15 | 1948 | 05/04/15 | 1948 | Ex. 23 |
| JM | 02/22/16 | 1345 | 02/27/16 | 1409 | Ex. 24 |
| JM | 02/23/16 | 1848 | 02/27/16 | 1410 | Ex. 24 |
| JM | 02/24/16 | 1803 | 02/27/16 | 1412 | Ex. 24 |
| JM | 02/25/16 | 1241 | 02/27/16 | 1413 | Ex. 24 |
| JM | 02/26/16 | 1742 | 02/27/16 | 1414 | Ex. 24 |

1345085

| Patient Initials | Date of Note | Time of Note | Date of Signature | Time of Signature | Exhibit # |
|---|---|---|---|---|---|
| JM | 02/27/16 | 1415 | 02/28/16 | 1732 | Ex. 24 |
| JM | 02/28/16 | 1732 | 02/29/16 | 1655 | Ex. 24 |
| JM | 02/29/16 | 1656 | 02/29/16 | 1656 | Ex. 24 |
| ReBl | 05/03/15 | 1719 | 05/04/15 | 1830 | Ex. 25 |
| ReBl | 05/05/15 | 1644 | 05/05/15 | 1644 | Ex. 25 |
| ReBl | 05/07/15 (for 05/06/15 visit) | 1659 | 05/07/15 | 1659 | Ex. 25 |
| ReBl | 05/07/15 | 1702 | 05/07/15 | 1702 | Ex. 25 |
| ReBl | 05/08/15 | 1717 | 05/09/15 | 1852 | Ex. 25 |
| ReBl | 05/10/15 | 1656 | 06/13/15 | 1824 | Ex. 25 |
| AC | 12/01/16 | 1918 | 12/02/16 | 1651 | Ex. 26 |
| AC | 12/02/16 | 1652 | 12/02/16 | 1652 | Ex. 26 |
| AC | 12/03/16 | 1626 | 12/03/16 | 1626 | Ex. 26 |
| AC | 12/04/16 | 2253 | 12/04/16 | 2255 | Ex. 26 |
| AC | 12/05/16 | 0946 | 12/05/16 | 1319 | Ex. 26 |

## THE ATTENDING PHYSICIANS SELF-REFERRED PATIENTS IN VIOLATION THE STARK LAW AND THE ANTI-KICKBACK STATUTE

82.     To enrich themselves at the expense of Government Programs, Manatee Physicians routinely refer patients to themselves or clinics in which they have a financial interest. This practice is illustrated in Exhibits 27 through 30, attached hereto, which are summarized in the below chart:

36

| Patient initials | Date of service | PCP | Attending | Physician to whom patient was referred | Exhibit # |
|---|---|---|---|---|---|
| RL | 04/12/16 | Narasimman | Narasimman | Narasimman | Ex. 27 |
| NM | 05/07/15 | Narasimman | Narasimman | Narasimman | Ex. 28 |
| NM | 03/05/15 | None | Narasimman | Narasimman | Ex. 29 |
| CF | 11/14/13 | Unknown | Narasimman | Soghrati/ Narasimman | Ex. 30 |

83.     When the patient arrives at the doctors' office or clinic for follow-up examination and/or treatment, he or she is frequently seen by a resident rather than the Manatee Physician who self-referred the patient or another doctor in that Manatee Physician's group practice.  This practice funnels patients from Manatee Memorial to clinics where the Manatee Physician can bill Government Programs for further patient care.  Both the Federal Stark Law (42 U.S.C. § 1395nn) and the Florida Patient Self-Referral Act of 1992 (Fla. Stat. § 465.053) prohibit doctors from referring patients to entities in which the doctors have a financial interest.

84.     The practice of improper referrals is integrated with the unlawful schemes, described above, whereby Manatee Physicians were absent during patient examination and billed Government Programs for services performed by residents.  After impermissibly examining a patient without a Manatee Physician present, residents at Manatee Memorial were routinely instructed to refer patients to Manatee Physicians or their clinics, such as MAXHealth.  At these doctors' offices or clinics, the patients were frequently examined or treated by another resident rather than the Manatee Physicians.

37

The Manatee Physicians would then bill Government Programs as though he or she had performed the follow-up care that was unnecessary and in fact provided by a resident. Through this fraudulent scheme, Government Programs were billed **twice** for services allegedly performed by the Manatee Physician - at the hospital **and** the clinic - when the Manatee Physician had never even seen the patient.

## DEFENDANTS HAD A FRAUDULENT SCHEME
## TO RECEIVE FEDERAL MONEY THROUGH THE
## DIRECT GRADUATE MEDICAL EDUCATION PROGRAM

85.     Manatee Memorial has been a teaching hospital since 2010, which means that certain expenses are reimbursed directly through the DGME program.  As a result, Manatee Memorial receives substantial sums of money from the government each year in exchange for providing an educational environment for the training of resident physicians.

86.     The DGME program also provides funding for payment to the Manatee Physicians for their teaching services.  For example, Dr. El Masry, Dr. Hernandez, Dr. Gomez, Dr. Narasimman, Dr. Marciales, Dr. Nonnemaker, and Dr. Kona are paid between $5,000 and $6,000 per month for teaching in the hospital setting, and are paid $500 per resident per month for teaching in one of Defendants' affiliated clinics.  These funds are paid by the DGME program.

87.     The DGME program requires that all of the funding Manatee Memorial receives from its participation in the program must be "**directly** related to educating

38

residents."[23]    The program also requires that medical students and residents are supervised by board-certified physicians.

88.    However, based on Dr. Rad's experience, there is very little education or teaching occurring at Manatee Memorial.  Indeed, as noted above, the medical students and residents are frequently left to provide care without the presence of any attending physicians.  In the instances when Manatee Physicians do supervise the residents and medical students, those Manatee Physicians, including Drs. El Masry, Hernandez, and Gomez, are routinely not board-certified and/or qualified to provide training and education.

89.    Manatee Memorial was aware that its residency program was not providing adequate training.  Several physicians, including the former program director and former associate program director, raised the issue with Manatee Memorial administration personnel.  Instead of addressing the problems with the residency program, Manatee Memorial fired those who complained.

90.    Manatee Memorial continues to provide false information to Medicare about its so-called education program in order to maintain its status as a teaching hospital eligible for DGME funds.  By lying about its educational opportunities and knowingly seeking and receiving funds through the DGME program for an inadequate teaching program, Defendants are not only soliciting and receiving excessive money from the

---

[23] Association of American Medical Colleges, *Becoming a Teaching Hospital: A Guide to the Medicare Requirements* at 1, *available at* http://www.cothweb.org/coth/resdevpublic/7.%20RECEIVING%20GME%20FUNDING /AAMCGuidetoMedicareRequirements2014.pdf (visited Jan. 23, 2018).

39

Government.  They are denying young physicians of the training necessary to pass their

board certifications and licensing tests.  They are also causing inadequately trained

physicians to enter the medical workplace, which creates risk of harm to patients.

## DEFENDANTS KNOWINGLY SUBMITTED BILLS FOR REIMBURSEMENT FOR INACCURATE OR UNNECESARY PATIENT SERVICES

91.     In addition to the foregoing, Manatee Memorial personnel regularly

engage in "upcoding," a practice in which a provider bills a health insurance payer for a

more expensive service than was performed.  Doctors and nurses at Manatee Memorial

regularly used billing codes for diagnoses and treatments on patient charts in accordance

with the guidance and direction of Manatee Memorial personnel.

92.     The practice of upcoding is done at the direction of Manatee Memorial's

billing department and is both entrenched and pervasive at the hospital.  Employees in the

billing department will frequently call or email a physician after reviewing bills

submitted by the physician for services provided.  Billing personnel will instruct the

physician to re-submit the patient care records using more "expensive" diagnosis and

treatment codes.  Billing personnel also routinely accompany the physicians as they

examine and treat patients and will instruct the physician in real-time as to how to record

the services provided so as to wrongfully maximize reimbursement.

93.     Employees engaged in the upcoding scheme were acting within the scope

of their employment by Defendants.  The practice was so pervasive that Defendants must

have either known of the actions of their employees or, at the very least, been willfully

blind regarding its commission.  As a result of this scheme, a significant percentage of

the bills submitted to Government Programs by Defendants and/or on Defendants' behalf

that contained intentionally false statements regarding the medical services provided, with the goal of receiving unjustified payments from the Government.

94.     As another example of the unlawful practices in place at Manatee Memorial, patients were often admitted to Manatee Memorial for conditions that did not require hospitalization.  For instance, because Manatee Physicians were not present when resident examined patients, the residents admitted patients that could have been safely discharged because there was no attending physician available to sign off on the release of the patient.  As another example of improper patient admission, unavailable Manatee Physicians regularly called for the admission of a patient based solely on a phone call with the resident.  These practices resulted in significant excessive and unnecessary costs that were billed to Government Programs for reimbursement.

## COUNT 1 – AGAINST ALL DEFENDANTS,
## FOR VIOLATIONS OF THE FALSE CLAIMS ACT:
## PRESENTING FALSE CLAIMS FOR PAYMENT (31 U.S.C. § 3729(a)(1)(A))

95.     Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

96.     Relator seeks relief against Defendants under Section 3729(a)(1)(A) of the FCA, 31 U.S.C. § 3729(a)(1)(A).

97.     As a result of practices among the Manatee Physicians of relying on medical students and residents to provide patient care in the absence of and/or on behalf the Manatee Physicians, and then creating false and/or misleading medical records that indicated that medical services were reviewed by the Manatee Physicians, Defendants submitted payments to Government Programs that contained false and fraudulent

41

statements.

98.     As a result of the scheme between residents and Manatee Physicians at Manatee Memorial and/or MAXHealth clinics, the Manatee Physicians created medical records and submitted bills for services allegedly performed by the Manatee Physicians that were in fact performed by residents in exchange for monetary payments.   Bills submitted to Government Programs identifying the Manatee Physicians as the provider of such services were therefore knowingly false and fraudulent in  violation federal AKS, 42 U.S.C. § 1320a-7b(a).

99.     As a result of the scheme among residents and Manatee Physicians at Manatee Memorial and/or MAXHealth clinics whereby Manatee Physicians would refer patients to their own private medical offices or clinics, where follow-up care was frequently provided by a resident rather than the Manatee Physician or a member of his or her medical group in violation of the Stark Law (42 U.S.C. 1395nn) and the federal AKS (42 U.S.C. § 1320a-7b(a), (b)(1) and (b)(2)), Defendants presented false and fraudulent claims for payments to Government Programs.

100.     As a result of the practices of Manatee Physicians to be frequently absent when residents examined and treated patients, Manatee Memorial made false and misleading statements regarding its training and educational program so as to fraudulently receive funding from Medicare through the DGME program in violation of the federal AKS, 42 U.S.C. § 1320a-7b(a).

101.     As a result of the practices of Manatee Physicians and other employees of Defendants, including upcoding and unnecessarily admitting patients to the hospital,

Defendants regularly submitted bills to Government Programs for services that were either not accurate, not provided, or unnecessary in violation of the federal AKS, 42 U.S.C. § 1320a-7b(a).

102.    Residents, Manatee Physicians, and other personnel involved in the above-mentioned schemes were acting within the scope of their employment by one or more of the Defendants, often with the Defendants' knowledge and/or approval.

103.    Accordingly, Defendants, through their employees, knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

104.    By reason of the false or fraudulent claims that Defendants knowingly caused to be presented to federal health care programs, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT 2 – AGAINST ALL DEFENDANTS, FOR VIOLATIONS OF THE FALSE CLAIMS ACT: USE OF FALSE STATEMENTS (31 U.S.C. § 3729(a)(1)(B))

105.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

106.    Relator seeks relief against Defendants under Section 3729(a)(1)(B) of the FCA, 31 U.S.C. § 3729(a)(1)(B).

107.    As a result of practices among the Manatee Physicians of relying on medical students and residents to provide patient care in the absence of and/or on behalf the Manatee Physicians, and then creating false and/or misleading medical records that

43

indicated that medical services were reviewed by the Manatee Physicians, Defendants submitted payments to Government Programs that contained false and fraudulent statements.

108.    As a result of the scheme between residents and Manatee Physicians at Manatee Memorial and/or MAXHealth clinics, Manatee Physicians created medical records and submitted bills for services allegedly performed by the Manatee Physicians that were in fact performed by residents in exchange for monetary payments.  Bills submitted to Government Programs identifying the Manatee Physicians as the provider of such services were therefore knowingly false and fraudulent in  violation federal AKS, 42 U.S.C. § 1320a-7b(a).

109.    As a result of the scheme among residents and Manatee Physicians at Manatee Memorial and/or MAXHealth clinics whereby Manatee Physicians would refer patients to their own private medical offices or clinics, where follow-up care was frequently provided by a resident rather than the Manatee Physician or a member of his or her medical group in violation of the Stark Law (42 U.S.C. 1395nn) and the federal AKS (42 U.S.C. § 1320a-7b(a), (b)(1) and (b)(2)), Defendants presented false and fraudulent claims for payments to Government Programs.

110.    As a result of the practices of Manatee Physicians to be frequently absent when residents examined and treated patients, Manatee Memorial made false and misleading statements regarding its training and educational program so as to fraudulently receive funding from Medicare through the DGME program in violation of the federal AKS, 42 U.S.C. § 1320a-7b(a).

111.    As a result of the practices of Manatee Physicians and other employees of Defendants, including upcoding and unnecessarily admitting patients to the hospital, Defendants regularly submitted bills to Government Programs for services that were either not accurate, not provided, or unnecessary in violation of the federal AKS, 42 U.S.C. § 1320a-7b(a).

112.    Residents, Manatee Physicians, and other personnel involved in the above-mentioned schemes were acting within the scope of their employment by one or more of the Defendants, often with the Defendants' knowledge and/or approval.

113.    In light of the above schemes, Defendants falsely certified and/or represented that the reimbursements they sought for medical services provided at their facilities were in full compliance with applicable federal and state laws prohibiting fraudulent and false reporting, including but not limited to the AKS and Stark Law. Those false certifications, statements, or representations caused federal health care programs to pay out sums that would not have been paid if those programs had been made aware of the falsity of the certifications, statements, or representations.

114.    Accordingly, Defendants caused the use of false records or statements material to false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

115.    By reason of these false records or statements, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages plus a monetary civil penalty for each false record or statement.

**COUNT 3 – AGAINST ALL DEFENDANTS,**
**FOR VIOLATIONS OF THE FALSE CLAIMS ACT:**
**CONSPIRING TO VIOLATE THE FALSE CLAIMS ACT**
**(31 U.S.C. § 3729(a)(1)(C))**

116.    Relator realleges and incorporates by reference the prior paragraphs as though fully set forth herein.

117.    Relator seeks relief against Defendants under Section 3729(a)(1)(C) of the FCA, 31 U.S.C. § 3729(a)(1)(C).

118.    As set forth above, Defendants conspired with its medical students, residents, attending physicians, and other health care professionals to create medical records with false or misleading information in violation of the federal AKS, 42 U.S.C. § 1320a-7b(a), thereby causing false and fraudulent claims to be presented to Government Programs seeking reimbursement for medical services that were not eligible for any reimbursement or for the reimbursement sought.

119.    As set forth above, Defendants conspired with its medical students, residents, attending physicians to enact a scheme of self-referral of patients in violation of the Stark Law (42 U.S.C. 1395nn) and the Federal AKS (42 U.S.C. § 1320a-7b(a) and (b)), thereby causing claims that contained false information and/or tainted by kickbacks to be submitted to Government Programs.

120.    Accordingly, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), in violation of 31 U.S.C. § 3729(a)(1)(C).

121.    By reason of the Defendants conspiracy to violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), the United States has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil

46

monetary penalty for each false claim.

## COUNT 4 – AGAINST ALL DEFENDANTS,
## FOR VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT,
## FLA. STAT. ANN. §§ 68.081 – 68.092

122.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 – 68.092.  Relator realleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

123.    Defendants violated the Florida False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly causing false claims to be presented to the State of Florida as described herein and violating the Florida Anti-Kickback Act (Fla. Stat. § 456.053), Florida Patient Broker Act (Fla. Stat. § 817.505), Florida Medicare Provider Agreement statute (Fla. Stat. § 409.907) and the Medicaid Provider Fraud Statute, (Fla. Stat. § 409.920).

124.    As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Florida.

125.    The State of Florida, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Florida would not otherwise have paid.

126.    By reason of these payments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against Defendants as follows:

47

(a) treble the Government's damages in an amount determined at trial, plus the maximum statutorily-allowed penalty for each false claim submitted in violation of the FCA or the Florida False Claims Act;

(b) the applicable administrative civil penalties for each violation of the AKS, Stark Law, Florida Anti-Kickback Statute, Florida Medicaid Fraud Act, and Florida Patient Brokering Act, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited or received, without regard to whether a portion of that amount was offered, paid or received for a lawful purpose;

(c) an award of costs and the maximum Relator award allowed pursuant to the FCA and Florida False Claims Act set forth above; and

(d) such further relief as is proper.

1345085

Dated:  January 25, 2018                          Respectfully submitted,

*/s/ Christopher L. Gadoury* **(Co-Lead Counsel)**    */s/ Jennifer L. Truelove*  **(Co-Lead Counsel)**
Christopher L. Gadoury (*pro hac vice* to be filed)   Jennifer L. Truelove (*pro hac vice* to be filed)
Chris.Gadoury@LanierLawFirm.com            jtruelove@mckoolsmith.com
Jonathan Wilkerson (*pro hac vice* to be filed)   MCKOOL SMITH P.C.
Jonathan.Wilkerson@LanierLawFirm.com        104 East Houston, Suite 300
THE LANIER FIRM                       Marshall, Texas 75670
6810 FM 1960 West                     (903) 923-9000
Houston, Texas 77069                   Fax: (903) 923-9099
(800) 723-3216
Fax:  (713) 659-2204                    */s/ Virginia I. Weber*_____
                               Virginia I. Weber (Florida Bar No. 30407)
                               vweber@mckoolsmith.com
                               Radu A. Lelutiu (*pro hac vice* to be filed)
                               rlelutiu@mckoolsmith.com
                               Dana E. Vallera (*pro hac vice* to be filed)
                               dvallera@mckoolsmith.com
                               MCKOOL SMITH P.C.
                               One Bryant Park, 47th Floor
                               New York, New York 10036
                               (212) 402-9400
                               Fax: (212) 402-9444

                               ***ATTORNEYS FOR RELATOR***
                               ***KIYAN RAD, D.O.***

49

1345085

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| [UNDER SEAL], on behalf of the<br>UNITED STATES OF AMERICA and the<br>STATE OF FLORIDA,<br><br>   Plaintiffs/Relator,<br><br>v.<br><br>[UNDER SEAL],<br><br>   Defendants. | Civil Action No.<br><br>8:18 cv 224 T 23 JSS<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**Filed Under Seal Pursuant to<br>31 U.S.C. § 3730(b)(2)** |

# FILED UNDER SEAL

2018 JAN 26  AM 11: 35
CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

FILED

1

1345085

S-1